## Munhall Borough Council Appeal.

Argued November 16, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, GUNTHER, WRIGHT and WOODSIDE, JJ.

*John E. Evans, Sr.,* with him *J. B. McAdoo* and *Evans, Ivory & Evans,* for appellant.

*Edward A. Tobias,* with him *Tobias & Tobias,* for appellee.

OPINION BY ROSS, J., April 15, 1954:

In this zoning controversy involving property in the Borough of Munhall, George Langol, lessee, appealed

to the County Court of Allegheny County from an order of the Board of Adjustment revoking a certificate of occupancy issued to him and his lessors pursuant to a prior ruling of the Board. The court below sustained the appeal and directed the municipal authorities to grant Langol a certificate. The Borough, intervenor in the court below, has appealed to this Court.

In June 1937 Michael Veslany and Mary Veslany became the owners of 1129 Ravine Street in Munhall. The premises consisted of a storeroom on the first floor and living quarters on the second. Until 1941 or 1942 the Veslanys operated a "grocery and confectionery and meat market" in the storeroom. Thereafter they leased the premises to various tenants for similar uses until May 1950, when the storeroom became vacant. Efforts were made to rent it for store purposes. In August 1951 Langol leased the premises.

The basic zoning ordinance of the Borough of Munhall was adopted in January 1942. The several use districts set up therein were "A" Residence District, "B" Residence District, Business District and Industrial District. The Veslany property was located in "B" Residence District.

With respect to the two residential and the business districts: "A building may be erected, altered or used, and a lot or premises may be used for any of the following purposes and for no other", followed by an enumeration of specific permitted uses. This format is varied somewhat in the provisions dealing with the Industrial District. The ordinance—after providing that buildings may be devoted to all uses permitted in an "A" and "B" Residence District and Business District—states: "In this district the land may be used and buildings may be erected, altered or used for any purpose except" enumerated prohibited uses.

In dealing with non-conforming uses the ordinance provides: "(1) The lawful use of land existing at the

time of the adoption of this ordinance, although such use does not conform to the provisions hereof, may be continued . . . (2) . . . If no structural alterations are made, a non-conforming use of a building may be changed to another non-conforming use of the same or a higher classification. (3) A non-conforming use shall not be changed to a use designated for a district having less restrictive regulations . . . (6) Whenever a non-conforming use of a building or portion thereof has been discontinued for a period of at least one (1) year, such non-conforming use shall not thereafter be re-established, and the future use shall be in conformity with the provisions of this ordinance."

Under the heading "Occupancy Permits" it provides: "No building, structure or land shall be used or changed in use until a certificate of occupancy and compliance shall have been issued by the Building Supervisor stating that the building, structure or land and the proposed use of the same complies with the provisions of this Ordinance. A like certificate shall be issued for the purpose of maintaining, renewing, changing or extending a non-conforming use. . . . A. . . certificate of occupancy and compliance shall be applied for and issued before an existing use of a building, structure or land shall be changed to any other use whatsoever."

A retail store of any description is not included in the permitted uses listed for "B" Residence District. The use of the present property as a store was, however, continued as a non-conforming use in accordance with the provisions of the zoning ordinance.

In August 1951 Langol applied for a certificate of occupancy to use 1129 Ravine Street for a restaurant with retail liquor license. This application was submitted to the Building Supervisor and the Planning Commission, but was considered and acted upon by the Board of Adjustment. Sinclair T. Powell, chairman

and secretary both of the Commission and the Board, testified that the Board required the applicant "to secure a petition, signed by people, residents, within a radius of 200 feet from 1129 Ravine Street" stating that they had no objection. Langol secured and presented such petition.

At the instance of the Board of Adjustment, a "special committee" consisting of three members of the Planning Commission was formed "to investigate the situation, and find out if the signatures on the petition were correct, if the people actually resided there, to canvass the neighborhood and find out whether there was any objection, and what the situation was, what it had been before in the way of a business location". The committee reported favorably to the applicant and recommended issuance of a permit to him. Publication was made of Langol's application for use of the property in connection with a restaurant and liquor license, in the local newspaper.

On November 20, 1951 the Board passed a resolution granting the permit, and on November 21, 1951 the Building Supervisor issued to Michael E. Veslany as owner and Langol as lessee a certificate of occupancy of the premises for a "tavern".

On January 3, 1952, Langol applied for and was granted a building permit to make alterations to the premises. In reliance upon this permit he expended "nearly Three Thousand Dollars" for "Redecorating the entire first floor; installing plumbing fixtures" and purchasing "things that were on the premises from the butcher shop which I could use". This work was carried on, according to a borough witness, in the "latter part of December" 1951, and the "first part" of January 1952.

Opposition to the Langol project developed sometime in January 1952 under the leadership of one Martin R. Martin, who lived "directly across the street"

in a house owned by his mother. Following a meeting of borough council, an "appeal" to the Board of Adjustment was filed with the Building Supervisor on January 29, 1952, and with the Board on February 4, 1952. It was signed by Martin, by the president of council for council, and by a number of other persons who resided in the vicinity, some of whom had signed Langol's petition. The complaints set forth in the appeal were, inter alia: "That the use of said premises as a tavern in which food, beer and intoxicating liquors may be sold is prohibited under Ordinance No. 960 (Zoning Ordinance) of the Borough . . . enacted January 14, 1942"; "A tavern is of a lower classification of use than that of a store"; and ". . . the certificate issued to Michael E. Veslany, as owner, and George Langol, as lessee, is not a certificate of occupancy and compliance and certifies no compliance whatsoever with the zoning laws of the Borough of Munhall."

On February 29, 1952, the Board revoked Langol's permit on the ground that the permit was issued under a mistake of fact regarding the attitude of residents in the vicinity, a majority of whom the Board then found "vehemently opposed".

Appellant borough contends that all right to continue the non-conforming use as a store was lost prior to the lease to Langol. This contention is predicated upon the provision of the ordinance to the effect that when a non-conforming use has been "discontinued" for a period of at least one year, it shall not be reestablished. *Haller Baking Company's Appeal*, 295 Pa. 257, 145 A. 77, held the word "discontinued" in such zoning ordinance equivalent to "abandonment"; and that to lose a non-conforming use there must appear an intention to abandon the same. See also *Krinks' Appeal*, 332 Pa. 236, 238, 2 A. 2d 700. In the present case the only evidence relevant to the question negatives the theory of abandonment advanced by the Bor-

ough. The Veslany property was admittedly vacant for more than a year, but during that period the owners attempted to rent it for store purposes. There was, therefore, no intention to abandon the non-conforming use and consequently the use was not "discontinued" in legal contemplation.

The serious question raised by the Borough is whether the zoning ordinance permits the changing of the non-conforming use for a store to that of restaurant with liquor license.

The zoning ordinance provides that in the Business District property may be used "for any of the following purposes and no other . . . (2) Store . . . (5) Restaurant, bakery, pastry, candy, confectionery, or ice cream place, where products are sold at retail . . ." Restaurant with liquor license is not listed among the uses permitted in the Business District, but neither is there express prohibition against the sale of the intoxicating liquor in the district. Further, the ordinance does not expressly mention restaurant with liquor license as a use permitted in the Industrial District, but neither is such use of land listed among the prohibited uses.

This zoning ordinance permits the change from one non-conforming use to another of the same or a higher classification. "Store", the present non-conforming use, and "restaurant" are permitted uses of property in the Business District and thus of the same classification. Langol proposed, and presumably is prepared, to operate an establishment in which food and liquor are served to the general public. If such an establishment can be considered a "restaurant", the certificate of occupancy and compliance was lawfully issued by the Board of Adjustment, and its revocation—without valid reason—was an abuse of discretion. Although the property in question is in "B" Residence District, we must, because of the non-conforming use provisions

of the ordinance, proceed as if it were in the Business District. The sole issue is whether premises upon which the business of selling food and liquor is conducted can be termed a restaurant.

The word "restaurant" is defined in Webster's New International Dictionary, Second Edition, as follows: "An establishment where *refreshments* or meals may be procured by the public; a public eating house". (Italics supplied.) The noun "refreshment" is defined in Webster as "That which refreshes; means of restoration or reanimation; specif., food or *drink* . . ." (Italics supplied.) The *Liquor Code*, Act of April 12, 1951, P. L. 90, authorizes the Liquor Control Board to issue retail liquor licenses to hotels, restaurants and clubs (Art. IV, sec. 401, 47 PS sec. 4-401). The *Code* defines restaurant as "a reputable place operated by responsible persons of good reputation and habitually and principally used for the purpose of providing food for the public, the place to have an area within a building of not less than four hundred square feet, equipped with tables and chairs accommodating at least thirty persons at one time". (Art. I, sec. 102, 47 PS sec. 1-102). It must be assumed that Langol will be permitted to sell liquor only if, and for only so long as, he complies with the requirements of the *Liquor Code*. We have no doubt that an establishment such as described in Article I, section 102 of the *Code* is a "restaurant".

Restrictions imposed by zoning ordinances must be strictly construed. *Lord Appeal,* 368 Pa. 121, 81 A. 2d 533; *Lukens v. Zoning Board of Adjustment,* 367 Pa. 608, 80 A. 2d 765; *Kline v. Harrisburg,* 362 Pa. 438, 68 A. 2d 182. If the zoning ordinance of the Borough of Munhall was intended to prohibit the sale of intoxicating liquor in the Business District, that intention should have been made clear by express language.

Assuming for the moment, however, that the Borough is correct in stating that its zoning ordinance

"specifically and clearly" prohibits the sale of intoxicating liquor in any but the Industrial District, in view of the fact that restaurants are permitted in an area where the sale of liquor is prohibited, we think that *Sawdey Liquor License Case,* 369 Pa. 19, 85 A. 2d 28, would require us to hold the prohibition invalid. In that case Sawdey and an associate commenced construction of a hotel in 1948 and a year later applied for a liquor license. After the hotel was half completed but before the liquor license was applied for, a zoning ordinance was adopted which designated the district in which the hotel was being erected as a "Mixed Occupancy" district. Restaurants, grocery stores, hotels and club houses were permitted uses in the "Mixed Occupancy" district; but the ordinance provided that "No license for the dispensing of intoxicating liquor in any form is permitted". Other provisions of the zoning ordinance rendered its operation prospective, not only as to completed structures but also to those in the course of construction. The Liquor Control Board refused the application for liquor license on the sole ground that the ordinance prohibited it.

The Supreme Court held that the prohibition against liquor licenses contained in the ordinance did not apply to a hotel in the process of erection when the ordinance was adopted. The Court went on, however, to discuss the power of a municipality to regulate the sale of liquor by zoning ordinance. It is, of course, that aspect of the case which is relevant herein. The Court conceded that a zoning ordinance may properly exclude hotels and taverns, like any other business, entirely from a residential area, but stated at page 25: ". . . an entirely different question is presented when it is attempted to regulate the details of a hotel business which it permits in the zone where state legislation has filled the entire field of liquor regulation. We think that such regulation is improper. . . . Zoning ordi-

nances, interfering as they do with the free use of property, depend for their validity on a reasonable relation to the police power." A zoning ordinance attempting to regulate the sale of liquor may bear a reasonable relation to the police power but (page 26) "even so municipalities may not invade the field of regulation which the State legislature has completely filled by its comprehensive liquor control act, an act that provides ample means to all communities to obtain prohibition at their option by vote of the people thereof . . . A municipality may not in the guise of a zoning ordinance *regulate* the business of dispensing liquor." The Supreme Court was, of course, considering a case in which a hotel proposed to sell intoxicating liquor against an express prohibition of a zoning law, and its discussion was naturally limited to hotels. A careful reading of the opinon, however, reveals that the principles enunciated are broad enough to include an attempt to prohibit the sale of liquor by a restaurant in a commercial use district.

The Borough places some reliance on *Veltri Zoning Case,* 355 Pa. 135, 49 A. 2d 369. In that case certain premises in the "A" residence district of the Borough of Munhall enjoyed the status of a non-conforming use " 'as a dairy store in which was sold sandwiches, cold cuts, ice cream, soda water, pop, milk shakes and coffee' ". Veltri purchased the property and proposed to sell intoxicating liquors "as part of what he called his restaurant business". The Board of Adjustment refused to grant a certificate of occupancy and compliance. The court below sustained the action of the administrative body and that judgment was affirmed by the Supreme Court, which stated at page 137: "It appears that during a period of three weeks beginning January 23, 1946, without having complied with the Zoning law, Veltri sold intoxicating liquors on the premises. The effect on the neighborhood was de-

scribed by witnesses. Their evidence supports the conclusion, reached by the learned court below, of the resulting change in use of the premises. Judge KENNEDY said: 'The Board of Adjustment has found as a fact that the appellant's privilege or license to sell intoxicating beverages has changed and extended the theretofore existing non-conforming use of the building which the appellant now owns. This Board has further found that the non-conforming use is not now in a higher classification. At the hearing in this Court there appears to be ample evidence to support these findings.' "

If the zoning ordinance was the same when the *Veltri* case was decided as it is now, it seems clear that the findings of the Board of Adjustment did not dispose of the question before it. The Munhall ordinance, it will be recalled, now permits the change from one non-conforming use to another of the *same* as well as a higher classification. Whether the use proposed by Veltri was of the same classification as the existing non-conforming use was not decided.

Judgment affirmed.